# Exhibit 1

Filed
D.C. Superior Court
10/30/2025 15:44PM
Clerk of the Court

**SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**CRIMINAL AND TRAFFIC DIVISION**

|  |  |  |
|---|---|---|
| DISTRICT OF COLUMBIA | ) | |
|  | ) | |
|  | ) | 2025-CTF-003570 |
|  | ) | Courtroom 316 |
| v. | ) | June 26, 2025 |
|  | ) | |
|  | ) | |
|  | ) | |
| MARQUITA TIBBS | ) | |
|  | ) | |

_____

**<u>MOTION TO SUPPRESS</u>**

Ms. Marquita Tibbs, through counsel, hereby respectfully moves this Court to suppress all evidence obtained from an unauthorized and unlawful stop by an officer of the United States Secret Service Uniformed Division ("USSS-UD"). Specifically, the officer lacked the authority to stop Ms. Tibbs at the intersection of 16th Street and V Street, N.W., for two primary reasons. First, under 18 U.S.C. § 3056A, Congress limited the jurisdiction of the USSS UD to the protection of the White House, and it has not been expanded through a cooperative agreement with the Metropolitan Police Department ("MPD") under D.C. Code § 5-133.17, as Congress has legislated. Second, 18 U.S.C. § 3056A limits the USSS UD's authority to make arrests to "offenses committed against the United States." The statute does not authorize the officers of the USSS UD to stop citizens for violations of District of Columbia traffic regulations. Nor does the statute permit the USSS UD to arrest citizens for driving under the influence ("DUI"), as DUI offenses are brought in the name of the District of Columbia, not the United States. Accordingly, Ms. Tibbs respectfully moves the Court to suppress the unlawful stop, and any evidence thereafter obtained.

**PROCEDURAL POSTURE**

In the early morning hours of December 21, 2024, USSS Uniformed Division Officer Daniel Clark arrested Ms. Tibbs for DUI.  On April 21, 2025, the Office of the Attorney General ("OAG") filed a criminal information charging Ms. Tibbs with DUI, in violation of D.C. Code § 50-2206.11; Operating While Impaired ("OWI"), in violation of D.C. Code § 50-2206.14; and possession of an open container of alcohol, in violation of D.C. Code § 25-1001(a)(2).  The Court arraigned Ms. Tibbs on August 11, 2025.  The case is set for a status hearing on December 17.

**RELEVANT FACTS**

According to the affidavit filed pursuant to *Gerstein v. Pugh*, 420 U.S. 103 (1975) ("*Gerstein* Affidavit"), at about 1:49 a.m. on January 5, 2025, Officer Clark allegedly observed a grey Chevy Malibu driving southbound on 16th Street, N.W. and claimed the vehicle failed to maintain a proper lane of travel.  Officer Clark also claimed that the vehicle traveled straight in a left-hand-turn only lane of travel.  Officer Clark activated his police cruiser's emergency equipment and stopped the Malibu at the intersection of 16th and V Streets, N.W., more than a mile away from the White House.  When Officer Clark approached the driver, later identified by her District of Columbia driver's license as Marquita Tibbs, the officer claimed Ms. Tibbs had watery and bloodshot eyes and smelled an odor of an alcoholic beverage coming from the vehicle and from Ms. Tibbs's breath.  Officer Clark directed Ms. Tibbs out of the Malibu and administered to her the Standardized Field Sobriety Tests, which she allegedly failed.  Officer Clark arrested and transported Ms. Tibbs to the United States Park Police ("USPP") station for arrest processing and for a USPP officer to administer a breath test to her.  Ms. Tibbs consented to a breath test with a result of 0.169.  Officer Clark was not authorized to do any of these things and the stop and arrest was unlawful.  Importantly, Officer Clark did not issue any Notice of Infractions ("NOI") for the

2

lane violation, as the USSS Uniformed Division does not have NOI pads to issue DMV citations. Further, the USSS Uniformed Division lacks basic and fundamental arrest processing facilities and equipment, such as a holding cell, breath testing equipment, or cameras for mug shots.

## **STATUTORY FRAMEWORK**

18 U.S.C. § 3056A defines the jurisdiction and authority of the USSS Uniformed Division and provides:

(a) There is hereby created and established a permanent police force, to be known as the "United States Secret Service Uniformed Division." Subject to the supervision of the Secretary of Homeland Security, the United States Secret Service Uniformed Division shall perform such duties as the Director, United States Secret Service, may prescribe in connection with the protection of the following:

(1) The White House in the District of Columbia;

(2) Any building in which Presidential offices are located;

(3) The Treasury Building and grounds;

(4) The President, the Vice President (or other officer next in the order of succession to the Office of President), the President-elect, the Vice President-elect, and their immediate families;

(5) Foreign diplomatic missions located in the metropolitan area of the District of Columbia;

(6) The temporary official residence of the Vice President and grounds in the District of Columbia;

(7) Foreign diplomatic missions located in metropolitan areas (other than the District of Columbia) in the United States where there are located twenty or more such missions headed by full-time officers . . . ;

(8) Foreign consular and diplomatic missions located in such areas in the United States, its territories and possessions, as the President, on a case-by-case basis, may direct;

(9) Visits of foreign government officials to metropolitan areas (other than the District of Columbia) where there are located twenty or more consular or diplomatic missions staffed by accredited personnel, including protection for motorcades and at other places associated with such visits when such officials are

3

in the United States to conduct official business with the United States Government;

(10) Former Presidents and their spouses, as provided in section 3056(a)(3) of title 18;

(11) An event designated under section 3056(e) of title 18 [18 USCS § 3056(e)] as a special event of national significance;

(12) Major Presidential and Vice-Presidential candidates and, within 120 days of the general Presidential election, the spouses of such candidates, as provided in section 3056(a)(7) of title 18 [18 USCS § 3056(a)(7)];

(13) Visiting heads of foreign states or foreign governments.

(b)

(1) Under the direction of the Director of the Secret Service, members of the United States Secret Service Uniformed Division are authorized to—

(A) carry firearms;

(B) make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony; and

(C) perform such other functions and duties as are authorized by law.

(2) Members of the United States Secret Service Uniformed Division shall possess privileges and powers similar to those of the members of the Metropolitan Police of the District of Columbia [("MPD")]

18 U.S.C. § 3056A(a), (b).

The Police Coordination Act of 1997, enacted by Congress in 1997 and amended by Congress in 2001 (now codified at D.C. Code § 5-133.17), permits "covered federal law enforcement agenc[ies]" to enter into agreements with the MPD for specific purposes and provides:

(a) Agreements. — Each covered Federal law enforcement agency may enter into a cooperative agreement with the Metropolitan Police Department of the District of

4

Columbia to assist the Department in carrying out crime prevention and law enforcement activities in the District of Columbia . . . .

(b) Contents of agreement. — An agreement entered into between a covered Federal law enforcement agency and the Metropolitan Police Department pursuant to this section may include agreements relating to:

(1) Sending personnel of the agency on patrol in areas of the District of Columbia which immediately surround the area of the agency's jurisdiction, and granting personnel of the agency the power to arrest in such areas;

(2) Sharing and donating equipment and supplies with the Metropolitan Police Department;

(3) Operating on shared radio frequencies with the Metropolitan Police Department;

(4) Permitting personnel of the agency to carry out processing and papering of suspects they arrest in the District of Columbia; and

(5) Such other items as the agency and the Metropolitan Police Department may agree to include in the agreement.

(c) Coordination with U.S. Attorney's Office. — Agreements entered into pursuant to this section shall be coordinated in advance with the United States Attorney for the District of Columbia.

(d) Covered federal law enforcement agencies described. — In this section, the term "covered federal law enforcement agency" means any of the following:

. . .
(21) Uniformed Division, United States Secret Service

. . . .

D.C. Code § 5.133.17(a)-(d).

When the Congressional Delegate for the District of Columbia introduced the Police Coordination Act of 1997 in Congress, she introduced it in mandatory form, requiring all federal agencies to enter into a cooperative agreement with the Metropolitan Police Department, and recognized that the USSS-UD did not have any authority to stop and arrest individuals or motorists on the public streets:

5

> We send many of our federal law enforcement officers to the state-of-the-art facility at Brunswick, Georgia. Then we come back and capture them inside federal buildings. One of the officers told me that in this day, when we are concerned about security, a federal police officer in a federal building, if he sees a van, a suspicious looking van outside a federal building, does not have the authority to go outside and ask that van to move along. We need to empower these police to do police work.

143 CONG. REC. 57, H1538 (daily ed. May 6, 1997) (statement of Cong. Del. Holmes-Norton).

The Council for the District of Columbia has implemented the provisions of D.C. Code § 5-133.17 through the Federal Law Enforcement Cooperation Act of 1999, D.C. Law 13-100 (May 9, 2000), now codified in D.C. Code §§ 5-301-5-303. D.C. Code § 5-301, entitled "Powers and duties of federal law enforcement officers when making arrests for nonfederal offense," provides:

> (a) When a federal law enforcement agency has entered into a cooperative agreement with the Metropolitan Police Department of the District of Columbia ("MPD") to assist MPD in carrying out crime prevention and law enforcement activities pursuant to § 5-133.17, a sworn federal law enforcement officer of a covered federal law enforcement agency as defined in § 5-133.17(d) ("federal officer"), who in his official capacity is authorized to make arrests, shall, when making an arrest in the District of Columbia for a nonfederal offense, have the same legal status and immunity from suit as an MPD officer if the arrest is made under the following circumstances:

> > (1) The federal officer has probable cause to believe that the person arrested has committed a felony;

> > (2) The federal officer has probable cause to believe that the person arrested has committed a misdemeanor; or

> > (3) The federal officer is rendering assistance to an MPD officer in an emergency at the request of that MPD officer.

> (b) A sworn federal law enforcement officer of a covered federal law enforcement agency as defined in § 5-133.17(d), who in his official capacity is authorized to make arrests, may be authorized by the covered federal law enforcement agency to carry weapons within the boundaries of the District of Columbia while in an off-duty status provided that:

> > (1) The cooperative agreement authorizes the federal officer to carry weapons while in an off-duty status; and

> > (2) The federal officer has training substantially similar to the weapons training requirements of the MPD.

6

D.C. Code § 5-302, entitled "Restrictions on powers and duties of federal law enforcement officers," provides:

Officers when acting under the authority granted in § 5-301(a) shall be subject to the restrictions imposed on MPD officers under the laws codified in Chapter 1 of this title. These restrictions include, but are not limited to, arrests under § 5-115.01, use of unnecessary or wanton force under § 5-123.02, and the use of prohibited techniques, as that term is defined in § 5-125.02(6).

D.C. Code § 5-303, entitled "Public information program; priority at scene," provides:

(a) The Chief of Police shall establish a continuing public information program to inform the public, at a minimum, of which police agencies located in the District of Columbia have authority to make arrests anywhere in the District.

(b) Any cooperative agreement with a federal law enforcement agency shall include procedures that establish clearly which agency has priority at the scene. In addition, before entering into a cooperative agreement, the Chief of Police shall make a finding as to:

(1) Whether misconduct by the federal officers should be covered by the Police Complaint Board; and

(2) Whether the public information program should be supplemented to inform the public of information concerning the specific cooperative agreement, and if so, how.

In accordance with D.C. Code § 5-303(b)(2), the MPD makes public on its website the "covered federal law enforcement agencies" with which it has entered into cooperative agreements under D.C. Code § 5-133.17(d). *See* https://mpdc.dc.gov/page/cooperative-agreements. These agreements include the authority of the federal law enforcement agency, the locations the agencies are permitted to patrol, and highlights the authority the agencies possess to arrest individuals for violations of the D.C. Code. MPD has entered into cooperative agreements with: (1) Amtrak Police Department; (2) Federal Reserve System Law Enforcement Agency; (3) Bureau of Engraving and Printing Law Enforcement Agency; (4) Defense Intelligence Agency Police Force; (5) Department of Defense Protective Service Agency; (6) Uniformed Division for the Federal Bureau of Investigation; (7) Federal Protective Service; (8) the United States Mint Police

7

Department; and (9) the National Zoological Park Police Department.  MPD has not entered into a cooperative agreement with USSS Uniformed Division.

### ARGUMENT AND POINTS OF AUTHORITIES

The USSS Uniformed Division, as a creature of a Congressional statute, has only those powers and authorities provided for in the enabling legislation creating it.  *District of Columbia Hous. Auth. v. District of Columbia Dep't. of Human Rights*, 733 A.2d 338, 341 n.8 (D.C. 1999). The statute creating the USSS Uniformed Division, 18 U.S.C. § 3056A, is clear and unambiguous about the area to which the Uniformed Division patrols/protects.  18 U.S.C. § 3056A(a).  The statute is also clear about the USSS Uniformed Division's arrest authority—that is, only for offenses committed against the United States.  18 U.S.C. § 3056A(b)(1)(B).  When an enabling statute is clear and unambiguous, the Court must give effect to the plain meaning of the provisions, *Baugh v. District of Columbia Dep't. of Consumer & Regulatory Affairs*, 611 A.2d 557, 558 (D.C. 1992), "with a view to their place in the overall statutory scheme," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).  Here, 18 U.S.C. § 3056A and D.C. Code § 5-133.17, both of which were passed by Congress, must be read harmoniously.  In this regard, 18 U.S.C. § 3056A defines the area to which the USSS Uniformed Division is responsible and its arrest authority, and D.C. Code § 5-133.17, permits expansion of that area and authority through a cooperative agreement with the MPD.

I. **The USSS Uniformed Division Lacked Authority Under 18 U.S.C. § 3056A to Stop and Arrest Ms. Tibbs.**

First, under 18 U.S.C. § 3056A, Congress limited the USSS Uniformed Division to the protection of the White House, Presidential Offices, the Treasury Building, the President, Vice President, former President and Vice Presidents, the temporary official residence of the Vice President and grounds, and in limited cases, foreign diplomatic missions and foreign heads of state.

8

18 U.S.C. § 3056A(a)(1)-(13).  Second, the USSS Uniformed Division's arrest authority is limited by 18 U.S.C. § 3056A to "arrests without [a] warrant for *any offense against the United States* committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony."  18 U.S.C. § 3056A(b)(1)(B) (emphasis added).  Indisputably, failure to maintain a lane, driving straight in a left-turn lane, and DUI do not qualify as "offense[s] against the United States" and 18 U.S.C. § 3056A does not justify the stop and arrest.

### A. Officer Clark lacked jurisdiction to stop Ms. Tibbs near the intersection located at 16th and V Streets, N.W.

The statutory language is clear and unambiguous in designating the specified locations to which the USSS Uniformed Division has a statutory duty to protect and the offenses for which they have authority to arrest without a warrant.  The intersection located at 16th and V Streets, N.W. is neither an enumerated location, nor a specifically named person or dignitary in 18 U.S.C. § 3056A(a).  While Officer Clark could certainly intervene if Ms. Tibbs's vehicle barreled toward the gates of the White House or Treasury Building, Ms. Tibbs traveled at a normal rate of speed more than one mile away from the White House, Treasury grounds, and the Eisenhower Executive Office building.  Ms. Tibbs posed no threat to those locations where Officer Clark's intervention would be required.

Nor did the situation similarly involve circumstances where the "fresh pursuit" doctrine would be applicable.  The statutory definition of fresh pursuit, which incorporates the common law doctrine and covers pursuing officers who believe a fleeing suspect has committed a felony, D.C. Code § 23-903, applies only to officers from another states, D.C. Code § 23-901 ("Any member of a duly authorized peace unit of any State . . . .").  However, officers from the USSS Uniformed Division do not operate in another State but are limited to protecting the locations

enumerated in 18 U.S.C. § 3056A(a)(1)-(13), almost all of which are in the District of Columbia. Moreover, even applying the common law doctrine of fresh pursuit, it applies to officers who pursue a suspect who has committed a felony or to officers who have reasonable grounds to believe a suspect has committed a felony. *See In re C.A.P.*, 633 A.2d 787, 790 (D.C. 1993) ("Under the common law doctrine of fresh pursuit, an officer in lawful pursuit could chase an individual, suspected of having committed a felony, into another jurisdiction and effectuate an arrest therein."). Here, Officer Clark allegedly witnessed Ms. Tibbs failure to maintain her lane and travel in a left-turn-only lane, which are hardly felonies that would justify pursuing and stopping her at the intersection of 16th and V Streets, N.W.

The Office of the Attorney General ("OAG") may rely on *Andersen v. United States*, 132 A.2d 155 (D.C. 1957), where a United States Capitol Police ("USCP") officer issued a ticket to a motorist involved in a traffic accident who was tying up traffic and causing "congestion" during the morning rush on a boundary street to the Capitol and subsequently arrested him for disorderly conduct. *Id*. at 156. In holding that USCP had such authority, the Court recognized that, because USCP could control traffic on the Capitol grounds, "the officers here had jurisdiction to act upon the traffic tie-up on a boundary street" and could arrest an individual who interfered with the conduct of those duties. *Id*. at 157. Here, however, the intersection of 16th and V Streets, N.W. is hardly a boundary street and is over a mile away from any location or person enumerated in 18 U.S.C. § 3056A.

The OAG may also rely on *C.A.P.*, where a USCP officer observed a vehicle, whose vent window had been smashed out, traveling inside USCP jurisdiction, but stopped it outside of that jurisdiction, believing it to be stolen. 633 A.2d at 788-89. Relying on the fresh pursuit doctrine,

10

the Court held that, because the USCP officer had reason to believe the vehicle was stolen, the USCP officer could pursue and stop the vehicle outside USCP jurisdiction. *Id*. at 791.

The OAG's expected reliance on *Anderson* and *C.A.P.* is misplaced for six reasons. First, as noted, 16th and V Streets are neither boundary streets, nor streets with any sort of nexus to traffic control on the White House Complex. Second, these decisions predate the passage of the Federal Law Enforcement Cooperation Act of 1999, D.C. Law 13-100 (May 9, 2000) (now codified in D.C. Code § 5-301, et. seq.), which was intended to clarify the jurisdiction of the multiple law enforcement agencies in the District of Columbia and unify coordinated actions in response to emergencies. *See* D.C. Code § 5-302(d) (cooperative agreements "shall include procedures that establish clearly which agency has priority at the scene"). Indeed, one can imagine the chaos that would ensue if jurisdictional boundaries and procedures were not defined and police departments argued over procedures and which agency had responsibility while the operational threat went undetected. Congress aimed the legislation at such failures and the Division's failure to follow these laws undermines the purpose for which they were passed in the first instance.

Third, USCP and its jurisdictional boundaries and enforcement authorities are specifically provided for by Congress. In this regard, 2 U.S.C. § 1961(a) exhaustively defines Capitol Grounds and provides USCP with the authority to police those grounds. Further, 2 U.S.C. § 1967(a) authorizes the USCP to enforce federal and District of Columbia laws involving "crimes of violence" and respond to situations "to prevent imminent loss of life or injury to persons or property." That jurisdiction to enforce is exhaustively defined right down to the street, intersection, and street curb in 2 U.S.C. § 1967(b). Still further, 2 U.S.C. § 1967(a) & (a)(4) permit the Capitol Police Board to enact traffic regulations for enforcement in the areas described in 2 U.S.C. § 1967(b)(1), and it has exhaustively done so in a 273-page regulatory framework approved by the

11

House Oversight Committee and the Senate Committee on Rules and Administration like the statute requires.[*]    There is no similar statute or exhaustive regulatory scheme defining the jurisdiction and authority for the USSS Uniformed Service other than 18 U.S.C. § 3056A, which does not support the stop and arrest here.  Indeed, "Congress provided no guidelines in [18 U.S.C. § 3056A] that inform how [the USSS leadership] should exercise the Uniformed Division's authority to enforce D.C. laws."  *FOP, D.C. v. Rubin*, 26 F. Supp. 2d 133, 140 (D.D.C. 1998).

Fourth, while it is unknown whether USSS Uniformed Division controls traffic inside the White House grounds, one fact is for certain—there is no indication from Officer Clark's affidavit that a single civilian car, traveling at 12:25 a.m. more than one mile away from the White House, stalled "the movement of traffic through the [White House] grounds" or created "traffic congestion on the boundary street" affecting that movement.  *C.A.P.*, 633 A.2d at 791.  The OAG cannot therefore justify Officer Clark's traffic stop on the basis that it was somehow attendant to the control of traffic on White House grounds.

Of course, the argument assumes that *C.A.P.* and *Andersen* are still good law given the extent to which Congress legislated to provide for cooperative agreements involving boundary roads.  Indeed, Congress "is presumed to know the law," *Collins v. United States*, 631 A.2d 48, 51 (D.C. 1993), and it makes no sense to permit a prior judicial precedent to read words out of a statute subsequently enacted by Congress that addressed an identical situation and identical subject matter.  It is well settled that "[e]ffect must be given to every word of a statute, and interpretations that operate to render a word inoperative should be avoided."  *1137 19th St. Assocs. Ltd. P'ship v. District of Columbia*, 769 A.2d 155, 161 (2001); *see School St. Assocs. Ltd. P'ship v. District of Columbia*, 764 A.2d 798, 807 (D.C. 2001) (en banc) ("Common rules of statutory construction

---

[*] https://www.uscp.gov/about/oversight/capitol-police-board-regulations

require [the Court] to avoid conclusions that effectively read language out of a statute whenever a reasonable interpretation is available that can give meaning to each word in the statute."); *Thomas v. District of Columbia Dep't of Employment Servs.*, 547 A.2d 1034, 1037 (D.C. 1988) ("A basic principle is that each provision of the statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous."). Here, *C.A.P.*, if interpreted prospectively, reads not just words, but entire provisions out of a Congressional statute enacted to prevent the chaos cooperative agreements were designed to solve.

Fifth, the OAG will not, and cannot, explain the reason nine other law enforcement agencies operating within the District of Columbia have chosen to follow the law by entering into cooperative agreements with MPD to enforce the District of Columbia law around the respective agencies' locations. While the OAG may rely on the permissive language of D.C. Code § 5-133.17 ("may include agreements . . . ."), the permissive language does not mean that the absence of a cooperative agreement magically bestows upon the USSS Uniformed Division a positive grant of authority to enforce District of Columbia traffic regulations in the area surrounding the agency. In fact, the permissive language makes perfect sense since it would be unlawful and incongruent to require a federal law enforcement agency, like USSS-UD, to expend its Congressional appropriation beyond the purpose for which the appropriation was made, or require certain procedures under which it conducts its law enforcement operations. *See e.g.*, 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made"); D.C. Code § 5-302 (when entering into a cooperative agreement, federal agencies are subject to the same restrictions imposed on MPD, including a three-hour time limit on custodial interrogations under D.C. Code § 5-115.01, a prohibition against the use of excessive force under D.C. Code § 5-123.02, and a prohibition against the use of choke holds under D.C. Code § 5-

13

125.02(6)).  But the USSS Uniformed Division cannot have it both ways: on the one hand, enforce any law whenever and wherever it wants; while on the other, be immune from restrictions governing that enforcement.

Sixth, practical considerations and the lack of traffic enforcement equipment demonstrate that the USSS Uniformed Division is not intended to enforce the District of Columbia traffic regulations and stop and arrest suspects for DUI or any other criminal traffic offenses.  The USSS Uniformed Division does not issue DMV citations, nor does it have a standard NOI pad, like the MPD, USCP, or the United States Park Police ("USPP").  The USSS Uniformed Division lacks a processing station for suspects, a holding cell, and lacks the ability to administer a chemical breath or urine test to suspects.  Indeed, the USSS Uniformed Division transports individuals to the USCP station, like it did in this case, and relies on the USCP to process DUI suspects and administer chemical breath and urine testing to them.  In other cases, the USSS Uniformed Division transports suspects to USPP or MPD, Second District, as it lacks fundamental arrest processing equipment.

This lack of traffic and DUI enforcement equipment is not, however, surprising because Congress does not allocate appropriated funds to the USSS-UD for such a mission.  Using appropriated funds for purposes beyond the purpose for which the funds were allocated runs afoul of 31 U.S.C. § 1301(a).  And Congress has never allocated funds for the USSS-UD to perform routine traffic and DUI enforcement.  *See e.g.*, The Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4459 (Dec. 29, 2023).  For example, Congress appropriated funds to the USSS's protective missions in the District of Columbia to include terrorist threats or attacks, 136 Stat. 3673, appropriated funds for construction, operations, and maintenance in connection with its protective functions, 136 Sta. 4684., but has not appropriated funds for the USSS-UD to conduct traffic and DUI enforcement in the District of Columbia.

These circumstances, along with the provisions in 18 U.S.C. § 3056A, support two legal propositions: (1) that the USSS Uniformed Division is not a traffic and DUI enforcement agency; and (2) neither Congress, nor USSS's leadership has allocated funds to facilities and equipment to support any such mission. *See Rubin*, 26 F. Supp. 2d at 140-41 (Plaintiffs "failed to persuade the court that . . . individual officers of the Uniformed Division [can] challenge their superiors' decisions about how best to allocate the division's limited resources to meet the community's need."). And it is undisputed that the USSS Uniformed Division's leadership has not entered into a cooperative agreement with MPD to patrol the area around the White House, *Powers-Bunce v. District of Columbia*, 541 F. Supp. 2d 57, 71 (D.D.C. 2008), which the *Rubin* decision makes clear would be required of the USSS Uniformed Division before undertaking such responsibilities, 26 F. Supp. 2d at 139. The lack of these considerations unequivocally demonstrates that the USSS Uniformed Division officer did not have the authority to do what he did here.

**B. Officer Clark lacked authority to enforce a violation of the traffic regulations and subsequently arrest Ms. Tibbs for DUI.**

There is no authority in 18 U.S.C. § 3056A that provides the power to USSS Uniformed Officer Clark to stop Ms. Tibbs for an alleged traffic violation and arrest her for DUI near the intersection of 16th and V Streets, N.W. Failing to maintain a lane or DUI are not "offenses against the United States" but are properly brought in the name of the District of Columbia. *District of Columbia v. Sullivan*, 436 A.2d 364 (D.C. 1981) As noted, the DUI arrest did not occur in any of the specified locations enumerated in 18 U.S.C. § 3056A(a)(1)-(13) but instead occurred more than a mile away from the White House, the Eisenhower Executive Office Building, the Treasury Building, the temporary residence of the Vice President, and any known foreign diplomatic mission. *Rubin*, 26 F. Supp. 2d at 138 ("As the successor to the White House Police and the Executive Protective Service, the Uniformed Division since 1977 has performed such duties as

15

protecting the White House, the Treasury Building, and foreign diplomatic missions.").  Ms. Tibbs traveled at a normal rate of speed more than one mile away from the White House and the grounds for the Treasury Building and Eisenhower Executive Office building.  There are no circumstances articulated in the *Gerstein* affidavit that traffic at 12:25 a.m. on 16th Street, N.W., was somehow congested or that Ms. Tibbs's travel interfered with the orderly movement of traffic on the White House grounds.  Nor did the affidavit state that the stop was somehow intertwined with, or related to, the USSS Uniformed Division's duty to protect the places enumerated in 18 U.S.C. § 3056A or control traffic within those places.  There is simply no nexus between the traffic offenses and protection of those locations and no indication that Ms. Tibbs committed an offense against the United States or committed a felony, which would justify fresh pursuit.  Based on Ms. Tibbs's path of travel one mile away from the White House, Officer Clark's pursuit and stop were not authorized by 18 U.S.C. § 3056A but instead must be established through cooperative agreement as provided for by Congress under D.C. Code § 5-133.17.  *See Rubin*, 26 F. Supp. 2d at 139.

## II.    The OAG's Expected Contrary Arguments Fail.

The OAG may claim that the USSS Uniformed Officer Clark was authorized based on the language in 18 U.S.C. § 3056A(b)(2) that "[m]embers of the United States Secret Service Uniformed Division shall possess privileges and powers similar to those of the members of the Metropolitan Police of the District of Columbia."  The federal district court, however, has rejected that interpretation, finding that term "similar" does not mean "the same."

> Were the court to adopt the committee's conflation of the terms 'similar' and 'the same,' the unintended result would be that the officers of the Uniformed Division and the Metropolitan Police would be left with *the same* privileges and powers.  The court declines the invitation to find that the Uniformed Division and the Metropolitan Police had the same law enforcement authority not only in the District of Columbia at large, but also in the White House, in the Treasury Building, and in foreign diplomatic missions.

*Rubin*, 133 F. Supp. 2d at 139.  While this case forecloses the OAG's anticipated argument, Ms. Tibbs discusses *Rubin* more fully to assist this Court in discerning what is happening here.

In *Rubin*, the plaintiffs, all USSS Uniformed Division Officers, sued the then-Deputy Chief of the USSS Uniformed Division, Steve Johnson, for certain disciplinary actions related to a policy memorandum prohibiting officers from enforcing "minor traffic laws" and directing officers to "refer persons in non-life-threatening situations to the D.C. Metropolitan Police."  26 F. Supp. 2d at 138.  Deputy Chief Johnson announced the new policy at a meeting and threatened the attending officers with disciplinary action or transfer if the officers did not comply.  *Id*.  One officer, however, secretly videotaped the meeting and released it to the media.  *Id*.  Several USSS Uniformed officers, through the Fraternal Order of Police, then sued the Deputy Chief over the policy.  *Id*.

The Plaintiffs sought a declaration from the federal court that the policy memorandum violated the former version of 18 U.S.C. § 3056A (3 U.S.C. § 202), in that the USSS Uniformed Division officers had a right to enforce District of Columbia laws because the statute provided that "[m]embers of the United States Secret Service Uniformed Division shall possess privileges and powers similar to those of the members of the Metropolitan Police of the District of Columbia." *Rubin*, 26 F. Supp. 2d at 138-39.  As noted, the federal court rejected the argument.  *Id*. at 139.

Important to the case here, the Court also found that to expand the USSS Uniformed Division's jurisdiction and arrest authority beyond that which was provided by 18 U.S.C. § 3056A, Congress specifically required such expansion through cooperative agreements with the Metropolitan Police Department.  *Id.* at 139 ("Congress has specifically provided that [the USSS Uniformed Division's authority to undertake law enforcement activities in the District of Columbia] may be the subject of cooperative agreements between the Uniformed Division and the Metropolitan Police.")  In other words, because the Deputy Chief had the authority to enter into a

cooperative agreement to permit USSS Uniformed officers to enforce D.C. law around the White House, the Chief could also decline to do so and order his subordinates to act accordingly.

> [T]he two agencies may coordinate their law enforcement activities by defining the areas of the District of Columbia where Uniformed Division officers have the power to arrest and the authority to paper and process suspects.  It would be beyond the court's sound discretion to declare that individual officers of the Uniformed Division have the right to final review over such a Congressionally-authorized management effort.

*Id.* at 139-40.  D.C. Code § 5-133.17, legislated by Congress, and the *Rubin* (1998) decision occurred well after *C.A.P.* (1993).  Congress intended the legislation to address the boundary issue in *C.A.P.* given the rise in the number of law enforcement agencies in the District around that same time and to empower federal police officers to assist MPD with crime control, who would not otherwise be authorized to do so in the absence of a cooperative agreement.  *See* 143 CONG. REC. 57, H1538 (daily ed. May 6, 1997) (statement of Cong. Del. Holmes-Norton).

Finally, the OAG may argue that the USSS-UD's "protective powers" permitted Officer Clark to stop Ms. Tibbs for a municipal traffic violation and arrest her for DUI.  This argument is without merit.  First, the USSS-UD's authority to police stops at the fence lines to the White House, Executive Office Building, and the Treasury Building based on the plain language of 18 U.S.C. § 3056A and D.C. Code § 5-133.17.  *See United States v. Simon*, 368 F. Supp. 2d 73, 76 (D.D.C. 2005) ("[W]here an MTP officer makes an arrest outside his or her jurisdiction, the officer violates the arrested individual's Fourth Amendment rights.").

Second, awarding officers of the USSS-UD this sort of unfettered discretion to decide where, when, and under what circumstances to invoke the "protective powers" to stop and arrest motorists is unconstitutional.  For example, a USSS-UD officer can decide if an expired license plate at four in the morning justifies a "protective powers" traffic stop, or if passing through a stop sign at three in the afternoon justifies a "protective powers" traffic stop.  Perhaps an expired

18

registration sticker, and expired inspection sticker, a suspicious tag, a broken taillight, or speeding away from the White House Complex justifies a "protective powers" traffic stop. Or maybe a bald tire, a dim headlight, the failure to use a blinker on a desolate road two miles away from the White House justifies a protective power stop. The discretion is standardless and relies solely on the discretion of the USSS-UD officer in the field. While USSS-UD may want it this way, the claimed "protective power" simply transforms a security measure into general law enforcement authority in the District at large, which is unsupported by the statutory language and the federal court holding in *Rubin*. Indeed, "[t]his kind of standardless and unconstrained discretion is the evil the [Supreme] Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed." *Delaware v. Prouse*, 440 U.S. 648, 661 (1979). Cooperative agreements that define an agency's jurisdiction and seizure authority under D.C. Code § 5-133.17, and are published pursuant to D.C. Code § 5-303, provide the "neutral" and "objective standard" that the Supreme Court discussed in *Delaware v. Prouse*, 440 U.S. 648 (1979) "to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field.'" *Id*. at 654-55 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 532 (1967).

### III.     Suppression Of The Evidence In This Case Is Required.

As established above, Officer Clark's actions were not authorized and the evidence discovered based on the unlawful stop and arrest must be suppressed. Congress has provided a pathway through cooperative agreements under D.C. Code § 5-133.17 to equip the USSS Uniformed Division with the power to enforce violations of the District of Columbia's traffic regulations and arrest motorists for criminal traffic offenses. The failure to follow this Congressionally-authorized management mandate should be met with swift suppression. Indeed, as noted in *C.A.P.*, suppression is required if the police agency stopped and arrested the suspect

19

outside its defined jurisdiction. 633 A.2d at 789-90. Suppression is especially appropriate here, since the USSS Uniformed Division has repeatedly operated above the law by stopping and arresting District citizens without authority for years. While it may be difficult for this Court to fathom that the USSS Uniformed Division lacks authority without a cooperative agreement, the conclusion is well supported by the relevant statutes and a reading to the contrary is at odds with Congressional intent. Moreover, the MPD has not made the public aware of the USSS Uniformed Division's jurisdictional authority, like it has for the nine other law enforcement agencies under D.C. Code § 5-303(a), which is intended to provide notice to the public concerning the identity of the agency that has the authority to stop citizens and the specific location where the agency is so authorized. The Court should suppress the evidence to force compliance with the law.

The OAG may argue that, because the USSS Uniformed Division is a federal law enforcement agency operating within the District, it is a law enforcement agency within the meaning of D.C. Code § 23-501(2) and authorized to make arrests without a warrant pursuant to D.C. Code § 23-581 for any crime wherever it wants. The OAG may then cobble this analysis together with 18 U.S.C. 3056A(b)(1)(C), which states that USSS Uniformed Division is authorized to "perform such other functions and duties as are authorized by law." Because D.C. Code §§ 23-501(2) and 23-581 authorize the USSS Uniformed Division to arrest citizens without a warrant in the District for any crime, the argument goes, 18 U.S.C. § 3056A(b)(1)(C) authorizes the USSS Uniformed Division to do what it did to Ms. Tibbs here. This argument fails for four reasons.

First, this expansive reading is not warranted because D.C. Code §§ 23-501 and 23-581 were passed by the Council for the District of Columbia and an expansive reading of these statutes would render D.C. Code § 5-133.17 (passed by Congress) completely trivial and ineffectual, obviating the need for any cooperative agreements. Indeed, every law enforcement agency in the

20

District of Columbia would satisfy the definition but the Council's laws do not relieve those agencies from following the Congressional mandate if they wish to enforce the traffic laws in specific areas. As the Court of Appeals repeatedly has held "[n]either the Council nor the electors of the District of Columbia can overrule acts of Congress." *In re Prosecution of Perrow*, 172 A.3d 894, 897 (D.C. 2017); *Hessey v. District of Columbia Bd. of Elections & Ethics*, 601 A.2d 3, 16 (D.C. 1991)

Second, this expansive reading would run afoul of the analysis in *Rubin*, 26 F. Supp. 2d at 139-40, and would rewrite 18 U.S.C. § 3056A(b)(2) by replacing the word "similar" with the words "the same." But it is well settled that the judicial function is to interpret the law, not rewrite it. *Crooks v. Harrelson*, 282 U.S. 55, 60 (193). As the *Rubin* Court held the USSS Uniformed Division does not have the *same* powers and privileges as that of MPD, and thus the OAG's expected strained reading of these statutes fails.

Third, as noted Congress "is presumed to know the law," *Collins*, 631 A.2d at 51, and by listing the USSS Uniformed Division as a "covered federal law enforcement agency" under D.C. Code § 5-133.17(d)(21), the Congress intended the USSS Uniformed Division to be an agency that should enter a cooperative agreement if it wished to enforce D.C. traffic regulations and arrest D.C. citizens for DUI. The OAG's expansive reading would, moreover, run afoul of the "basic principle is that each provision of the statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous." *Thomas*, 547 A.2d at 1137. Finding that the USSS Uniformed Service is immune from entering cooperative agreement renders superfluous the Congressional language that it is a "covered federal law enforcement agency." D.C. Code § 5-133.17(d)(21).

21

Fourth, the expansive reading would violate the Council's own statutory mandate that "[t]he Chief of Police shall establish a continuing public information program to inform the public, at a minimum, of which police agencies located in the District of Columbia have authority to make arrests anywhere in the District." D.C. Code § 5-303(a). The Chief of Police has announced the agencies that have entered into cooperative agreements, but the Chief has not recognized any agency as having "authority to make arrests anywhere in the District." Accordingly, the OAG's expected analysis wreaks havoc on the statutory scheme and rewrites it, instead of recognizing the harmonious interpretation that USSS Uniformed Division must enter a cooperative agreement with MPD to justify the enforcement of traffic regulations and offenses around the White House.

Finally, the OAG may claim that the stop was justified because Officer Clark relied in good faith on an authority that he did not have. The USSS Uniformed Division can hardly claim that it acted in good faith. Indeed, the USSS Uniformed Division and its officers have known since the *Rubin* decision in 1998 that it did not have the authority without a cooperative agreement to enforce the District of Columbia traffic regulations or arrest citizens for misdemeanor traffic offenses that do not involve an offense committed against the United States. Moreover, the good faith doctrine does not apply to mistakes of law, such as jurisdiction and authority. "This is because an officer's mistake of law, no matter how reasonable or understandable, cannot provide the objective basis necessary for either probable cause or reasonable, articulable suspicion." *Whitfield v. United States*, 99 A.3d 650, 655 (D.C. 2014) (citation and quotation marks omitted). And under those circumstances, the good-faith exception to the exclusionary rule is inapplicable. *Id*. at 656. Accordingly, the stop and the evidence obtained thereafter should be suppressed.

**WHEREFORE**, Ms. Tibbs respectfully moves this Court to suppress all evidence obtained after the unauthorized and unlawful stop.

Respectfully Submitted,

*John Martorana*

John D. Martorana
D.C. Bar 500084
Counsel for Ms. Tibbs

## CERTIFICATE OF SERVICE

I, John D. Martorana, hereby certify and affirm that I served a copy of this Motion to Suppress on Assistant Attorney General, Cora Moy, via email and this Court's electronic filing system on this 30th day of October 2025.

*John Martorana*

John D. Martorana
D.C. Bar 500084
Counsel for Ms. Tibbs

23

**SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**CRIMINAL AND TRAFFIC DIVISION**

| | | |
|---|---|---|
| DISTRICT OF COLUMBIA | ) | |
| | ) | |
| | ) | 2025-CTF-003570 |
| | ) | Courtroom 316 |
| v. | ) | December 17, 2025 |
| | ) | |
| | ) | |
| | ) | |
| MARQUITA TIBBS | )) | |

---

## <u>ORDER</u>

Upon consideration of the parties' motions and arguments, the defendant's motion is hereby

**GRANTED**.  It is **ORDERED** that the evidence recovered after the unauthorized and unlawful

stop is **SUPPRESSED**.

Signed this ___ day of ____, 2025.


_____
Associate Judge


24